UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| GUADALUPE RODRIGUEZ and JOSE LOPEZ, on behalf of themselves and as legal guardians and parents of C.L., a minor individual with disabilities, | Case No. 1:12-cv-00390-CWD |
| Plaintiffs, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| INDEPENDENT SCHOOL DISTRICT OF BOISE CITY, NO. 1, | |
| Defendant. | |

## INTRODUCTION

Before the Court is the Motion for Summary Judgment (Dkt. 24) filed by

Defendant, the Independent School District of Boise City, No. 1 (BSD), in this action

under the Individuals with Disabilities Education Act (IDEA). 20 U.S.C. § 1400 et seq.

Plaintiffs Guadalupe Rodriquez and Jose Lopez filed this administrative appeal on behalf

of themselves and as parents of C.L., the disabled student at the center of this lawsuit.

C.L.'s Parents generally allege that BSD violated the IDEA by failing to provide C.L. a

free appropriate public education, or FAPE, during the 2011-2012 school year.

C.L.'s Parents further claim Hearing Officer Jean Uranga (HO Uranga) committed

several legal and factual errors in her June 21, 2012 decision, which found BSD did not

violate the IDEA and denied all of Parents' requested relief. BSD requests that the Court affirm HO Uranga, grant summary judgment in favor of BSD on all of C.L.'s and his Parents' claims, and dismiss the Complaint with prejudice. After careful review of the administrative record, the additional evidence, relevant authorities, and the parties' written and oral arguments, the Court will affirm in part and reverse in part HO Uranga's decision and deny BSD's motion for summary judgment.

## BACKGOUND

### 1.      Factual History

C.L. is a 15-year-old student diagnosed with Autism Spectrum Disorder and Anxiety Disorder. His autism results in significant cognitive and developmental deficits. For example, C.L.—who has an approximate IQ of 40—often communicates his wants and needs in two and three word phrases. Due to his disability, C.L. was found eligible for and received special education from BSD under an Individualized Education Program (IEP) developed under the IDEA.

During the 2010-2011 school year, C.L. attended sixth grade at Garfield Elementary School within BSD. As contemplated in his IEP, C.L. received special education and related services in the structured learning center at Garfield, a self-contained program for students with autism and behavioral issues. In December of 2010, BSD conducted its three-year reevaluation of C.L. As part of that reevaluation, BSD conducted a Functional Behavioral Assessment (FBA) and prepared a Behavioral Intervention Plan (BIP) to address C.L.'s problematic behaviors at school.

The FBA, dated December 12, 2010, was prepared by a team that included teachers, therapists, a psychologist, and C.L.'s Parents. (Dkt. 16, Ex. 510.) The FBA notes that C.L. is frequently noncompliant, impulsive, and may wet or soil himself when angry. Other behaviors include difficulty keeping his hands to himself, hitting, kicking, pushing, screaming, vulgar language, and exposing himself. The FBA theorizes that the purpose of C.L.'s behaviors is to attract attention from adults and peers. In addition, the FBA provides a variety of intervention strategies for BSD staff, such as limiting unstructured time, spending time in a "cool down" area when problem behaviors occur, reminders about personal space, and rewards and penalties for behaviors using preferred objects or sensory activities.

Also in December of 2010, BSD found that C.L. continued to be eligible for special education and related services under the disability category of "Autism Spectrum Disorder." (Dkt. 16, Ex. 507.) A revised IEP, dated December 15, 2010, was developed with input from C.L.'s Parents, his teachers, and BSD staff. The IEP notes that C.L.'s autism causes anxiety and behavioral issues, as well as significant impairments in an array of academic and developmental areas. Because of his special needs, the IEP contemplates that C.L. would continue to receive special education and related services in a structured learning center. The IEP also notes that C.L. "has a lot of anxiety[, which] prevents him from participating in many new tasks and situations." (Dkt. 16, Ex. 512 at 8.)

Under the December 2010 IEP, FBA, and BIP, C.L. began attending Hillside Junior High School within BSD in late August, 2011. Hillside houses BSD's only

structured learning center program specifically for autistic junior high school students. To attend Hillside, C.L. rode a school bus to and from his home for approximately one hour in each direction.

C.L. attended class at Hillside with seven other students and five adult staff led by special education teacher, Kelsie Badger. Hillside's structured learning center is in a portable building and features a "quiet/sensory room" with headphones and other equipment available for student use. (Dkt. 16, Ex. 521.) BSD staff documented C.L.'s school activities and behaviors in a daily communication log, which was provided to C.L.'s Parents each day. (Dkt. 16, Exs. 103-105.)

Ms. Badger characterized C.L.'s behaviors at Hillside as "severe" from "day one." (Dkt. 16-44, Badger Test. 35:15-22.) Consistent with the behaviors noted in the December 2010 FBA, C.L.'s behaviors in the fall of 2011 included "hitting and kicking, exposing himself, [and] hands in his pants." (*Id.* at 40:17-18.) Although the precise reason for C.L.'s behavior is unclear from the record, it is apparent that C.L. was behaving this way both at home and at school. It is also clear that C.L.'s mood medication dosage had been reduced during the fall of 2011, (Dkt. 16, Ex. 531, 532, 534, 535), and that behavioral changes are "very common" during such medication changes. (Dkt. 16-46, Kingsbury Test. 703:11-704:1.)

Beginning September 23, 2011, BSD staff maintained a detailed log of C.L.'s behaviors at school. (Dkt. 16, Ex. 530.) The purpose of the behavior log was to identify patterns and share the observations with Dr. Timothy Leavell, C.L.'s treating behavioral

pediatrician. In addition, BSD attempted to address C.L.'s behaviors with various positive reinforcement techniques, as contemplated by his BIP.

C.L.'s inappropriate and sometimes aggressive behaviors at school continued from late September into mid-October, 2011. (Dkt. 16, Ex. 105.) At one point, C.L. stabbed Ms. Badger's arm with a pencil, puncturing the skin and leaving a mark. (Dkt. 16-44, Badger Test., 78:14-25.) On September 22, C.L. was sent home early due to his aggressive behavior towards students and his teacher. (Dkt. 16, Ex. 523.) He kicked a classroom aide hard enough to leave a mark on October 10. (Dkt. 16, Ex. 105 at 7-8.) C.L. was also sent home early on October 12 because he hit Ms. Badger in the face, leaving a handprint and causing swelling. (Dkt. 16, Ex. 523.) When C.L.'s father arrived to pick up C.L., C.L.'s father requested a meeting with BSD to discuss C.L.'s behaviors.

Friday October 14, 2011, was C.L.'s last day at Hillside. C.L. did not return to school until June of 2012. Although BSD's behavior log notes several instances of hitting, inappropriate touching, and other behaviors on October 14, (Dkt. 16, Ex. 530), Ms. Badger explained that C.L. had an "excellent day" at school because his behaviors "were minor" relative to previous days. (Dkt. 16-44, Badger Test. 77:1-9.) The following week, Ms. Badger learned of an incident during C.L.'s bus ride home on October 14, and was told the incident was the reason C.L. did not return to school.

Reports prepared by the bus driver and bus monitor indicate that C.L. repeatedly pushed buttons on the dashboard console of the bus as he was disembarking on October 14. (Dkt. 16, Ex. 625, 626.) The bus driver attempted to redirect C.L.'s attention while the bus monitor took C.L. by the right arm and physically directed him off the bus to his

waiting grandmother. An investigation report prepared by the bus company's insurer indicates that a second incident occurred during the bus ride on October 14. (Dkt. 46-2.) The investigator interviewed two minors who rode the bus with C.L. and saw C.L. stand while the bus was moving. The minors reported that the bus monitor told C.L. to sit down and then pushed C.L. into the seat with his foot. Both minors characterized this contact as a moderate push, rather than a kick, and neither reported any injuries. Neither the bus monitor nor the bus driver mentioned this pushing incident in their reports, however.

Three days later, on October 17, C.L.'s mother took him to the emergency room. A report prepared by the hospital states that C.L. chiefly complained of "bilateral knee pain" and that his mother stated that C.L. was kicked by the bus driver. (Dkt. 16, Ex. 628.) The hospital report further notes a "small" abrasion on C.L.'s left elbow, as well as "mild swelling," "slight discoloration" of the left knee and thigh, pain in both knees, but "normal ambulation." (*Id.*) C.L.'s parents declined x-rays because of C.L.'s anxiety about the x-ray machine. Ultimately, C.L. was discharged in a stable, self-ambulatory condition with instructions to return if his conditions worsened or new conditions developed.

While at the hospital, the attending physician requested that a social worker talk to C.L. and his Parents about a possible battery. (*Id.*) The social worker met with C.L. and his Parents and later contacted the police department to make a report. The Boise Police Department report prepared on October 17 indicates that C.L.'s mother wished to press charges for battery against Ms. Badger and the bus driver. (Dkt. 16, Ex. 627.) The police report states that C.L. was "pushed against the wall" by Ms. Badger and "kicked" by the bus driver. The investigating officer conducted follow-up interviews with both Ms.

Badger and the bus monitor. Ms. Badger denied pushing C.L. against the wall and offered

her opinion that C.L. previously had untruthfully claimed Hillside teachers and students

hit him. She also and described C.L.'s at-school behavior consistent with the notes in the

behavior logs. The bus monitor's statements were consistent with his report described

above, and the monitor denied that C.L. fell or hit his knees on the bus. The police report

was routed to the Boise City Prosecutor's Officer for review, but no further action was

taken.

Also on October 17, 2011, BSD personnel began attempting to schedule a meeting

with C.L.'s Parents to review C.L.'s IEP and BIP.[1] Although C.L.'s Parents were not

present, BSD went forward with the IEP team meeting on October 20. At that time, BSD

personnel reviewed C.L.'s IEP and BIP, and determined that the structured learning

center at Hillside continued to be the appropriate placement for C.L. (Dkt. 16, Ex. 107.)

BSD received a letter from C.L.'s father on October 26, 2011, which requested an

updated FBA and a facilitated IEP team meeting. (Dkt. 16, Ex. 108.) In the letter, C.L.'s

father advocated for a BIP that specifically addressed C.L.'s anxiety and behavior. The

letter also stated that C.L. "is currently experiencing an enormous amount of anxiety, due

to incidents that occurred at school and on the bus. As a result, he does not want to return

to school at this time." (*Id.*)

Acting on this request, BSD sought C.L.'s Parents' permission to conduct a new

FBA and update C.L.'s BIP. (Dkt. 16, Ex. 110.) Starting November 9, 2011, and

---

[1]     The record is unclear whether BSD attempted to schedule the meeting because of C.L.'s father's request on October 12, C.L.'s absence from school on October 17, or some other reason.

culminating on December 13, 2011, BSD conducted five facilitated IEP team meetings in an effort to update C.L.'s IEP, BIP, and FBA.[2] C.L.'s Parents were present at each of these meetings and were assisted by a Spanish language interpreter provided by BSD. After the fifth meeting, BSD provided an updated IEP, FBA, and BIP to C.L.'s Parents on December 14, 2011. (Dkt. 16, Ex. 587.) Six days later, C.L.'s Parents rejected the proposed IEP, FBA, and BIP and objected to BSD's failure to provide C.L. homebound services during his prolonged absence from school. (Dkt. 16, Ex. 123.)

Legal counsel for C.L.'s Parents initially raised the issue of homebound services at the first facilitated IEP team meeting on November 9, 2011. However, the team did not discuss the matter because it was "not on the agenda." (Dkt. 16, Ex. 546 52:10.) At the second meeting on November 16, the team briefly discussed Parents' request for homebound services, but BSD personnel insisted C.L. could and should return to Hillside immediately. (Dkt. 16, Ex. 552.)

BSD formally rejected C.L.'s Parents' request for homebound services in a notice dated November 18, 2011. The stated reason for this refusal was that there was no documentation to indicate C.L. suffered from an "illness or accident that necessitates an absence from school for more than ten consecutive school days." (Dkt. 16, Ex. 116.) BSD

---

[2]      The 19-person IEP team consisted of C.L.'s Parents; Ms. Badger; several consulting special education and general education teachers; C.L.'s service coordinator; Hillside's principal; a speech/language pathologist; an occupational therapist; BSD's special education coordinator; BSD's special education supervisor; a facilitator from the State Department of Education; a school psychologist; three attorneys and a paralegal for C.L.'s Parents; and an attorney for BSD. A Spanish language interpreter also was present.

maintained this position throughout the facilitated meeting process and did not formally

assess whether an at-home placement would be appropriate.

On December 5, 2011, BSD received a letter from Dr. Joseph Kiehl, C.L.'s

pediatrician. Dr. Kiehl recommended that C.L. receive homebound services due to his

fear of returning to Hillside. (Dkt. 16, Ex. 117.) In Dr. Kiehl's opinion, homebound

services would be necessary only until C.L. could be "evaluated further by Dr. Leavell

and Northwest Neurobehavioral Health and a concrete plan is developed for his

schooling." (*Id.*) The letter also notes C.L. would see Dr. Leavell in January of 2012.

On December 9, 2011, BSD, with C.L.'s Parents' consent, sent Dr. Kiehl a series

of questions concerning this recommendation, including: "What do you see as the

benefits of homebound services?" (Dkt. 16, Ex. 126.) On January 30, 2012, BSD

received Dr. Kiehl's response, which stated:

> Nothing, other than I thought that is what the family and the school were
> desiring until his IEP, behavior intervention plan, and medication plan were
> in place such that his disruptive/concerning behaviors could be better
> helped/controlled. If you don't find there is any issue, he'd be free to
> continue at Hillside.

(*Id.*)

BSD also received a letter from Dr. Leavell on January 31, 2012. The letter

indicates Dr. Leavell mistakenly assumed C.L. was receiving homebound instruction. But

Dr. Leavell otherwise recommended that C.L. receive close supervision in a "very small,

well controlled educational environment." (Dkt. 16, Ex. 127.)

After evaluating C.L. in January, 2012, Dr. Jodie Cohen and Dr. Trevor Hall of

Northwest Neurobehavioral Health offered a recommendation consistent with Dr.

Leavell's. They specifically noted that C.L.'s "school refusal seems to be driven by a desire to escape from negative affect… and aversive social situations." (Dkt. 16, Ex. 129 at 9.) Based on this finding, Dr. Cohen and Dr. Hall recommended a gradual return to school supplemented with positive reinforcement, school scenario role playing, and efforts to build C.L.'s social and coping skills. C.L.'s treating psychologist, Dr. James Connelly, also recommended a gradual transition back to school in a letter dated February 16, 2012. (Dkt. 16, Ex. 132.)

A sixth facilitated IEP team meeting was held on February 2, 2012. The meeting focused on a review of the assessment plan for C.L. and a review of the Parents' homebound services request. (Dkt. 16, Ex. 128.) At the meeting, counsel for C.L.'s Parents made clear their legal position that C.L.'s disability precluded his return to Hillside and that BSD had not adequately assessed the need for him to gradually transition back to school. In response, BSD remained steadfast in its position that C.L. could return to Hillside at any time. BSD's Special Education Coordinator, Charlie Silva, acknowledged that she did not understand C.L.'s "negative association with school" and did not know why C.L. could not immediately return to Hillside. (*Id*. at 16.)

Following this meeting, counsel for BSD emailed the Parents' counsel with a proposal to implement the December 2011 IEP and BIP at a different school, Les Bois Junior High School in BSD. (Dkt. 16, Ex. 601.) Then, at the seventh and final IEP team meeting on February 10, 2012, the parties discussed the potential of placing C.L. at Les

Bois, a setting with seven students and five staff.[3] (Dkt. 16, Ex. 130.) The parties also discussed a plan for slowly transitioning C.L. back into the school environment.

On February 21, 2012, C.L.'s Parents filed a request for a due process hearing under the IDEA. The Parents' hearing request sought, among other relief, an IEP, FBA, and BIP specifically tailored to C.L.'s needs; a placement that comports with the IDEA in a school closest to C.L.'s home; and compensatory education to make up for the time C.L. did not attend school.

On February 24, 2012, BSD sent C.L.'s Parents a notice, requesting the Parents withdraw their December 20, 2011 objection to the updated IEP, FBA, and BIP. The notice proposed to implement the December 2011 IEP and BIP at Les Bois Junior High School and to gradually transition C.L. back to school, as recommended by C.L.'s medical providers. However, C.L.'s Parents did not withdraw their objection, and this litigation ensued.

Significantly, on May 25, 2012, the IEP team agreed that C.L. could transition into a summer school program under an IEP identical to the one BSD proposed in December 2011. (Dkt. 46-5.) After his prolonged absence from school, C.L. gradually transitioned into the summer school program in June of 2012. In the late summer of 2012, C.L. began attending Les Bois Junior High School under the December 2011 IEP. (Dkt. 46-6.) In a neurodevelopmental follow-up report dated March 25, 2013, Dr. Leavell notes that C.L.

---

[3]     Unlike Hillside, the Structured Learning Center at Les Bois Junior High School is not a specialized autism program.

"continues to manifest behavioral symptoms of autism," but "[h]e is connected with appropriate services." (Dkt. 46-10.)

## 2. Procedural History

At the request of C.L.'s Parents, a due process hearing was held before HO Uranga from May 1-4, 2012. The issues before HO Uranga were: (1) whether BSD failed to provide C.L. with an appropriate IEP that addressed his anxiety about returning to Hillside; (2) whether C.L. was entitled to homebound services pending transition back to the school environment; and (3) whether C.L. was entitled to compensatory education to "make up for lost time" during the BSD's failure to provide C.L. with educational services during his prolonged absence from school. (Dkt. 16-6 at 4-5.) On June 21, 2012, HO Uranga issued her Findings of Fact, Conclusions of Law and Order denying all relief requested by C.L.'s Parents. (Dkt. 16-2.)

Following HO Uranga's decision, C.L.'s Parents timely filed their Complaint under 20 U.S.C. § 1415(i)(2), which provides that "[a]ny party aggrieved by the findings and decision made [by a hearing officer]. . . shall have the right to bring a civil action . . . in a district court of the United States." The Complaint alleges HO Uranga committed legal error by: (a) finding C.L. "was not suspended or expelled from school" and was therefore not entitled to homebound services on those grounds (Dkt. 1 ¶ 36,); (b) sanctioning BSD's inadequate efforts to reintegrate C.L. into the classroom (*Id.* ¶ 37); and (c) upholding BSD's decision not to provide homebound services because C.L. could have returned to Hillside Junior High School at any time. (*Id.* ¶ 38.)

C.L.'s Parents also allege various factual errors in the hearing officer's findings related to C.L.'s credibility as a reporter of fact, the reasons for his behaviors at school, whether C.L. perceived being sent to the "quiet room" as punishment, and the reason for his prolonged absence from school, and whether C.L.'s medical providers encouraged him to return to school without any qualifications. (*Id.* ¶¶ 26-34.) C.L.'s Parents do not, however, here allege that BSD violated any of the IDEA's procedural mandates.

On November 26, 2012, in connection with the current appeal, counsel for C.L.'s Parents informed BSD that they intended to conduct discovery. Counsel for BSD responded by stating that there was no right to discovery in an appeal from an administrative proceeding, prompting C.L.'s Parents to move for an order clarifying whether discovery was available in this IDEA action. On March 11, 2013, the Court responded in the affirmative and permitted the parties to engage in limited discovery. (Dkt. 19.) Discovery proceeded through the spring and summer of 2013.

On August 8, 2013, BSD filed a motion to augment the record, (Dkt. 22), along with the instant motion for summary judgment (Dkt. 24). On the same day, C.L.'s Parents moved for additional time to complete discovery, a request that was granted with an extension through September 5, 2013. (Dkt. 25.)

In mid-August, 2013, the parties asked the Court to decide a number of discovery issues regarding BSD's disciplinary records for C.L.'s teacher and classroom paraprofessionals. (Dkt. 26, 30.) After a September 6, 2013 hearing, the Court determined it could not resolve the discovery dispute based on the record before it. Accordingly, the Court ordered BSD to lodge for in camera review the personnel files for C.L.'s teacher,

Kelsie Badger, and two paraprofessionals who worked with C.L. in Ms. Badger's classroom. (Dkt. 41.) After reviewing these records, the Court concluded they contained nothing relevant to the issues in this appeal—particularly, the alleged abuse of C.L. by BSD personnel. Accordingly, the Court denied Parents' motion to compel, granted BSD's motion for protective order, and extended the deadline for motions to supplement the record to November 22, 2013. (Dkt. 47)

After the supplementation deadline passed, the Court granted in part and denied in part BSD's motion to supplement the record. (Dkt. 48.) The record now consists of the administrative record compiled by HO Uranga, (Dkt. 16), and the additional evidence admitted for consideration by the Court's order on BSD's motion to supplement. The remaining matter before the Court is BSD's Motion for Summary Judgment, (Dkt. 24), to which C.L.'s Parents filed a response (Dkt. 37). The Court heard oral argument on the motion for summary judgment on February 26, 2014, and the matter is now ripe for review.[4]

## STANDARD OF REVIEW

C.L.'s Parents bring suit under the IDEA's judicial review provision, 20 U.S.C. § 1415(i)(2). The IDEA directs the Court to "receive the records of the administrative proceeding[,] hear additional evidence at the request of a party[, and base] its decision on

---

[4]    On March 4, 2014—after the Court took this matter under advisement—BSD filed C.L.'s IEP dated December 4, 2012. (Dkt. 52.) C.L.'s Parents object to this late submission. (Dkt. 54.) BSD did not include the 2012 IEP in its August 8, 2013 motion to supplement the record, the deadline for motions to supplement expired on November 22, 2013, and the Court has not requested or authorized additional motions to supplement. Accordingly, the Court will sustain C.L.'s Parents' objection and not consider the 2012 IEP for any purpose.

the preponderance of the evidence." 20 U.S.C. § 1415(i)(2)(C). "Congress intended the courts to make bounded, independent decisions—bounded by the administrative record and additional evidence, and independent by virtue of being based on a preponderance of the evidence before the court…." *Town of Burlington v. Mass. Dep't of Educ.*, 736 F.2d 773, 791 (1st Cir. 1984), *aff'd sub nom. Burlington Sch. Comm. v. Mass. Dep't of Educ.*, 471 U.S. 359 (1985).

Although the common deferential standard for administrative appeals does not apply to IDEA cases, full de novo review is not appropriate. *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1473 (9th Cir. 1993) (adopting *Town of Burlington*, 736 F.2d at 790-91). The United States Supreme Court has recognized that courts lack the expertise to formulate educational policy, an area traditionally reserved to state policymakers and education experts. *Bd. of Educ. v. Rowley*, 458 U.S. 176, 207-08 (1982). Accordingly, the district courts must give "due weight" to the hearing officer's decision and must not "substitute their own notions of sound educational policy for those of the school authorities which they review." *Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811, 817 (9th Cir. 2007) (quoting *Rowley*, 458 U.S. at 206). Moreover, the Court "gives particular deference where the hearing officer's administrative findings are 'thorough and careful." *R.B. ex rel. F.B. v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 937 (9th Cir. 2007) (quoting *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1524 (9th Cir. 1994)).

Because C.L.'s Parents seek reversal of the administrative decision, they bear the burden of proof. *Clyde K. v. Puyallup Sch. Dist., No. 3*, 35 F.3d 1396, 1398-99 (9th Cir. 1994) (superseded by statute on other grounds). But BSD bears the ultimate "burden for

substantive compliance with the IDEA." *Anchorage Sch. Dist. v. M.P.*, 689 F.3d 1047, 1055 (9th Cir. 2012).

## DISCUSSION

The pivotal issue in this administrative appeal is whether C.L. was denied FAPE by BSD. C.L.'s Parents claim that he was denied FAPE—and is therefore entitled to compensatory education—because BSD: (1) improperly implemented his then-existing IEP through October 14, 2011; (2) declined to provide homebound services from October 14, 2011 until C.L. returned to school in summer 2012; and (3) failed to provide an updated IEP, FBA, and BIP that appropriately addressed C.L.'s anxiety about returning to school. C.L.'s Parents also maintain that HO Uranga committed clear error by finding 20 U.S.C. § 1412(a)(1)(A) did not apply to C.L.'s claim for homebound services because C.L. was not suspended or expelled from school. The Court addresses each of these contentions below.[5]

## 1.     IDEA Review in the Context of a Motion for Summary Judgment

As a preliminary matter, the Court must determine how the familiar standards for determining motions for summary judgment interact with the IDEA's distinctive judicial

---

[5]     C.L.'s Parents also request "trial by jury on any issue so triable." (Dkt. 1 ¶ 39.) But both parties agree that no court to consider the question has found a right to a jury trial in an IDEA case. Nevertheless, C.L.'s Parents note a lack of binding authority on the point. Although the Court has identified no Ninth Circuit Court of Appeals case squarely addressing the issue, the Court agrees with courts that have considered it—there is no right to a jury trial in IDEA case because the statute authorizes equitable remedies only. *E.g., Barnett v. Fairfax County Sch. Bd.*, 721 F.Supp. 755 (E.D. Va. 1989), *aff'd*, 927 F.2d 146 (4th Cir. 1991) (per curiam); *Whitehead v. Hillsborough County Sch. Bd.*, 918 F.Supp. 1515 (M.D. Fla. 1996); *Loren F. ex rel. Fisher v. Atlanta Indep. Sch. Sys.*, 349 F.3d 1309 (11th Cir. 2003).

review provision. The bounded, independent character of IDEA judicial review fits somewhat awkwardly within the procedural framework generally applicable to civil cases. In particular, the usual rules for summary judgment—including inferences drawn in favor of the non-moving party and the need to avoid deciding disputed issues of material fact—produce a "puzzling procedural problem" for a district court faced with a motion for summary judgment in an IDEA case. *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 892 (9th Cir. 1995). That problem arises because IDEA cases often involve mixed questions of law and fact and frequently turn on disputed issues of material fact. This case is no different, as the parties dispute material facts such as the cause and severity of C.L.'s anxiety after October 14, 2011.

The United States Court of Appeals for the Ninth Circuit endorses a pragmatic solution. Even if a party labels the procedure a motion for summary judgment, "as a practical matter" the Court must nevertheless follow the IDEA's mandate to "read the administrative record, consider the new [additional] evidence, and make an independent judgment based on a preponderance of evidence and giving due weight to the hearing officer's determinations." *Id.*; *see also Lillbask ex rel. Mauclaire v. Conn. Dept. of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005) ("[A] motion for summary judgment in an IDEA case often triggers more than an inquiry into possible disputed issues of fact. Rather, the motion serves as a 'pragmatic procedural mechanism' for reviewing a state's compliance with the procedures set forth in IDEA and determining whether the challenged IEP is reasonably calculated to enable the child to receive educational benefits.") Denying summary judgment on what is "in substance an appeal from an administrative

determination" only to rehash the same legal and factual issues in the technically appropriate procedural "pigeonhole" would amount to an inefficient use of the judicial, public, and private resources already devoted to this case. *Capistrano*, 59 F.3d at 892; *see also* Fed. R. Civ. P. 1 (procedural rules "should be construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding.").

Accordingly, the Court finds that the standards and burdens applicable to more typical summary judgment motions would, if applied here, lead to only delay and duplication of effort. The Court has received the administrative record, ruled on several motions related to additional evidence, (Dkt. 47, 48), and allowed supplementation of the record. The ultimate decision in this case should not be delayed simply because the vehicle for that decision is labeled "motion for summary judgment." Therefore, the Court will review BSD's motion for summary judgment in the manner prescribed by 20 U.S.C. § 1415(i)(2)(C), basing its decision on a preponderance of the evidence and giving due weight to HO Uranga's findings and conclusions.[6]

## 2.     Applicability of 20 U.S.C. § 1412(a)(1)(A)

C.L.'s Parents boldly claim HO Uranga found "C.L. has no right to FAPE." (Dkt. 1 ¶ 36.) In support, they highlight language in HO Uranga's decision that states 20 U.S.C. § 1412(a)(1)(A) "is inapplicable" because "the Student was not suspended or expelled from school." (Dkt. 16-2 at 23.) This argument dramatically mischaracterizes the statutory language and HO Uranga's decision.

---

[6]      At the hearing on BSD's motion for summary judgment, C.L.'s Parents indicated they had ample opportunity to respond to BSD's arguments, albeit not in the order they desired.

For a state to be eligible for federal funds under the IDEA, the state must ensure "[a] free appropriate public education is available to all children with disabilities residing in the State between the ages of 3 and 21, inclusive, including children who have been suspended or expelled from school." 20 U.S.C. § 1412(a)(1)(A). In other words, school districts must provide FAPE to all eligible students, even students who are suspended or expelled from school.

In their post-hearing brief to HO Uranga, C.L.'s Parents cited 20 U.S.C. § 1412(a)(1)(A) for the proposition that "[t]he IDEA makes no distinction regarding homebound students, and imposes the same requirement on BSD to provide FAPE to homebound students as it is required to provide to other students." (Dkt. 16-4 at 10.) True as that proposition may be, it does not establish C.L.'s eligibility for homebound services. Eligibility for homebound services depends on the IEP team's considered judgment. Apparently aware of this distinction, HO Uranga observed that 20 U.S.C. § 1412(a)(1)(A) is inapplicable to Parents' claim for homebound services because C.L. was neither suspended nor expelled from school. When read in context, it is clear that HO Uranga did not intend to suggest or find that C.L. has absolutely no right to FAPE. Thus, the Court finds no error in HO Uranga's observation that 20 U.S.C. § 1412(a)(1)(A) is not applicable to this case.

**3.    Whether C.L. Received FAPE**

The mandate that school districts provide FAPE to all eligible students is the IDEA's central substantive requirement. The Act defines FAPE as:

special education and related services that—(A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program required under [20 U.S.C. § 1414(d)].

20 U.S.C. § 1401(9). A school district provides FAPE for a disabled student if it: (1) complies with the IDEA's procedures; and (2) the IEP developed through those procedures is reasonably calculated to enable eligible children to receive educational benefits. *Rowley*, 458 U.S. at 206-07.

Although courts frequently review the substantive adequacy of IEPs, that review is not an opportunity to formulate educational policy or resolve questions of methodology. *Id* at 208. Congress left that task to the States and, more specifically, to the teams that evaluate disabled students and develop their IEPs. *See generally* 20 U.S.C § 1412. The courts' limited role is to ensure that school districts provide a "basic floor of opportunity" to children eligible for special education and related services under the IDEA. *Rowley*, 458 U.S. at 201.

C.L.'s Parents do not challenge the procedural adequacy of BSD's evaluations.[7] Therefore, the Court need only address the substantive adequacy of C.L.'s IEP.

---

[7]     At the due process hearing, C.L.'s Parents argued that BSD violated IDEA procedures related to notice of, and parental participation in, an October 20, 2011 IEP team meeting. HO Uranga concluded that C.L.'s Parents failed to establish violations of the IDEA's procedures, and C.L.'s Parents did not raise these procedural issues in their appeal.

## A. *BSD Appropriately Implemented C.L.'s IEP Through October 14, 2011*

The 2010 IEP in place when C.L. started at Hillside Junior High School was reasonably calculated to enable C.L. to receive educational benefit. The IEP contemplated that C.L. would attend a structured learning center and receive a range of specialized services intended to address his academic and developmental needs. The 2010 IEP also addressed C.L.'s behavioral problems and anxiety in accordance with the IEP team's assessment of those conditions in December 2010. The record indicates C.L. was making progress towards his 2010 IEP goals through early June, 2011. (Dkt. 16, Ex. 519.) And it is undisputed that C.L. was receiving educational benefit from the 2010 IEP before he started at Hillside.

However, C.L.'s Parents argue the 2010 IEP was no longer appropriate once C.L. started attending Ms. Badger's class at Hillside in late August of 2011. In support, they note that C.L. exhibited severe problematic behaviors throughout the early fall of 2011. C.L.'s Parents further allege Ms. Badger mistreated C.L. by stabbing him with a pencil, locking him in the quiet room, and depriving him of food and water. In essence, they claim that C.L. would not have misbehaved had BSD treated him appropriately and properly implemented his IEP.

The Parents' evidence that C.L. was abused by BSD personnel consists only of C.L.'s reports, as related by his mother. But the record demonstrates C.L. is not a reliable reporter of objective fact. Therefore, HO Uranga properly discredited allegations of abuse that were based solely on C.L.'s reports.

Aside from C.L.'s reports, the record is devoid of evidence to substantiate the allegations that Ms. Badger, or any other BSD employee, abused C.L. These allegations were explored in depth during the discovery phase of this proceeding, and the Court concluded, after in camera review, that the personnel files for Ms. Badger and two paraprofessionals contained nothing relevant to Parents' claims. (Dkt. 47.) Rather, the record indicates that BSD staff, including Ms. Badger and the bus monitor, worked to redirect C.L. and use positive reinforcement techniques, as contemplated by the BIP. And, although C.L.'s Parents take issue with BSD staff sending C.L. to the quiet room when he misbehaved, such "cool down" time was expressly recommended in his FBA. (Dkt. 16, Ex. 510.)

When C.L. started at Hillside, his anxiety and his behavioral problems were addressed by the 2010 FBA, BIP, and IEP. BSD staff appropriately implemented C.L.'s BIP and IEP even as his behaviors became increasingly aggressive. A number of factors, including medication changes and the new environment, likely contributed to C.L.'s behavioral problems. Recognizing this, BSD staff logged C.L.'s behaviors, communicated those behaviors to Dr. Leavell, and consulted with C.L.'s Parents. Such efforts show not only that BSD recognized new behavioral evaluations were necessary, but that, before C.L.'s absence, BSD was actively gathering information needed for those evaluations.

While it is clear that the early fall of 2011 was a difficult time for both C.L. and BSD staff, it is also clear that C.L. received services reasonably calculated to provide

educational benefit through October 14, 2011. Accordingly, C.L. was not denied FAPE before his absence from school, beginning October 17, 2011.

**B.      *BSD Did Not Adequately Evaluate C.L.'s Need For Homebound Services***

The IDEA contemplates a continuum of educational placements to meet the needs of children with disabilities. Depending on the nature and severity of his disability, a child may be instructed in the regular classroom, a specialized classroom, at home, or in a care facility. 20 U.S.C. § 1412(a)(5); *see also* 34 C.F.R. § 300.115 (continuum of placements). However, children with disabilities must be educated in the "least restrictive environment." 20 U.S.C. § 1412(a)(5). The Act allows "removal of children with disabilities from the regular educational environment… only when the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." *Id*. The purpose of this requirement is to "mainstream" children with disabilities to the maximum extent possible, reserving more restrictive placements for children with special needs. It is up to the IEP team to determine the least restrictive environment for each student. 34 C.F.R. § 300.116(a).

With regard to homebound services, Idaho law supplies an additional criterion. Under Idaho Code § 33-1001(6), a "homebound student" is one who "would normally and regularly attend school, but is confined to home or hospital because of an illness or accident for a period of ten (10) or more consecutive days." Citing this standard, BSD and HO Uranga concluded that C.L. was not homebound because he was not confined to his home because of an illness or accident.

C.L.'s Parents argue that C.L. was entitled to homebound services because his perception of events in early fall 2011 produced such extreme anxiety that he could not ride the bus or attend school after October 14, 2011. Like BSD and C.L.'s medical providers, C.L.'s Parents wanted C.L. to return to school. But they also wanted to ensure that C.L.'s extreme anxiety regarding Ms. Badger's classroom and the bus were considered and addressed before he returned. In this sense, the requested homebound services were intended to be a stop-gap, whereby C.L. could continue his education while the IEP team formulated a plan to transition him back into the school environment. From October 17, 2011 until its February 2012 proposal to place C.L. at Les Bois Junior High School, however, BSD consistently maintained that C.L. could return to Hillside at any time.

Echoing BSD's position, HO Uranga found C.L. was not eligible for homebound services. She determined C.L.'s Parents did not meet their burden to present evidence that C.L. needed homebound services. She further found that C.L.'s "Parents had no justifiable reason for pulling the Student out of school or for continuing to keep him out of school." (Dkt. 16-2 at 19.) Ultimately, HO Uranga concluded C.L.'s Parents unjustifiably allowed C.L. to dictate the decision to stay home, discrediting their concerns about forcing him to return to Ms. Badger's classroom. This conclusion is critical because it amounts to a determination that C.L. was not entitled to educational services unless he returned to Hillside. But, in contrast with her thorough and careful reasoning elsewhere in her decision, HO Uranga's analysis on this point is sparse, conclusory, and

not deserving of controlling weight. *See R.B. v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 942-43 (9th Cir. 2007).

Upon review of the record, the Court concludes BSD denied C.L. FAPE by summarily rejecting his Parents' request for homebound services without adequately evaluating C.L.'s need for an alternative placement pending completion of an appropriate reintegration plan. FAPE entitles disabled children to an opportunity to receive educational benefits—an opportunity that must, of course, be meaningful. *J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 432-33 (9th Cir. 2010). "Congress did not intend that a school system could discharge its duty under the IDEA by providing a program that produces some minimal academic advancement, no matter how trivial." *Amanda J. ex rel. Annette J. v. Clark County Sch. Dist.*, 267 F.3d 877, 890 (9th Cir. 2001).

During his absence, C.L.'s academic advancement was not just minimal or trivial; it was nonexistent. Meanwhile, BSD had a continuing duty to provide FAPE to C.L. Indeed, the IDEA contemplates review and revision of a child's IEP "as appropriate" in light of, among other things, information provided by a child's parents, the child's needs, or other matters. 20 U.S.C. § 1414(d)(4). It is clear that BSD, with the Parents' input, began a process to revise C.L.'s IEP, BIP, and FBA in October, 2011. That process ultimately produced an appropriate plan to reintegrate C.L. into a different school, manage his behaviors at school, and provide C.L. educational benefits. But, as the increasingly adversarial IEP review process dragged on from late October through February C.L. received no educational services from BSD.

BSD's position then, and now, is that C.L. could simply return to Hillside, where FAPE awaited him. This position is inconsistent with BSD's later proposal, and the IEP team's later agreement, to implement C.L.'s IEP at Les Bois Junior High School after a reintegration period. More importantly, this position ignores C.L.'s Parents' legitimate concerns about a school environment and bus ride that made their son extremely anxious. BSD's position also ignores C.L.'s unique needs, which, according to C.L.'s Parents, changed due to his experiences at Hillside and on the bus. Such a dismissive attitude undermines the Parents' essential role in the development of their child's educational program. "Parents," after all, "not only represent the best interests of their child in the IEP development process, they also provide information about the child critical to developing a comprehensive IEP and which only they are in a position to know." *Amanda J.*, 267 F.3d at 882.

Citing C.L.'s fear of the bus and Ms. Badger's classroom, C.L.'s Parents initially requested homebound services at the first facilitated IEP Team meeting on November 9, 2011. Following the second IEP Team meeting, BSD formally rejected Parents' request for homebound services on November 18, 2011. The rejection letter put the burden on C.L.'s Parents to provide "documentation to indicate [C.L.] has an illness or accident that necessitates an absence from school for more than ten consecutive school days." (Dkt. 16, Ex. 116 at 1.) C.L.'s Parents responded with a December 5, 2011 letter from Dr. Kiehl that specifically recommended homebound services until C.L. could be further evaluated by other medical providers "and a concrete plan is developed for his schooling." (*Id.*, Ex. 117.)

At this point, C.L. had not received educational services for more than one month. Instead of evaluating C.L.'s need for homebound services in light of his Parents' concerns and Dr. Kiehl's recommendation, BSD again shifted the burden. On December 9, 2011, BSD asked Dr. Kiehl to justify his recommendation in writing. Dr. Kiehl eventually responded in January, 2012, stating that C.L. would be free to continue at Hillside *if* BSD did not "find there is any issue." (Dkt. 16, Ex. 126.) Although Dr. Kiehl's note states C.L. may return to Hillside, it also acknowledges that a plan to address C.L.'s behaviors was not in place. In other words, Dr. Kiehl's response is equivocal, noting that it was ultimately BSD's responsibility to evaluate C.L.'s educational needs. But BSD repeatedly put the burden on C.L.'s Parents justify their homebound services request.

The Ninth Circuit has recently explained that such burden shifting is inappropriate. *Anchorage Sch. Dist. v. M.P.*, 689 F.3d 1047, 1055 (9th Cir. 2012). School districts have an "affirmative duty to review and to revise, at least annually, an eligible child's IEP." *Id.* Furthermore, "[n]othing in the statute makes that duty contingent on parental cooperation with, or acquiescence in, the state or local educational agency's preferred course of action." *Id.* Even when parents adopt a litigious approach, a "school district cannot abdicate its affirmative duties under the IDEA." *N.B. v. Hellgate Elementary Sch. Dist.*, 541 F.3d 1202, 1209 (9th Cir. 2008).

BSD argues that homebound services would be inconsistent with the IDEA's least restrictive environment mandate. In support, BSD cites the opinions of various IEP team members. Although Ms. Badger opined that her classroom was the best placement for C.L., she gave no explanation for her opinion. (Dkt. 16-44, Badger Test. at 102:20-25,

103:1-16.) Likewise, consulting special education teacher, Marie Kingsbury, concluded homebound instruction was not appropriate for C.L. because she believed the Hillside staff could make necessary adjustments to address C.L.'s anxiety and behaviors. (Dkt. 16-46, Kingsbury Test. 748:2-11.) In contrast, C.L.'s service coordinator, Paola Lamberti, testified that C.L. feared returning to Hillside because he perceived that Ms. Badger hit him and sent him to a dark room. (Dkt. 16-45, Lamberti Test. 288:16-23.)

BSD never assessed the least restrictive environment for C.L. in light of his perception of events at Hillside or on the bus. Neither Ms. Badger nor Ms. Kingsbury observed C.L. after October 14, 2011. And BSD's Special Education Coordinator, Dr. Charlie Silva, admitted that she was "confused" by the reports of C.L.'s severe anxiety but nonetheless concluded C.L. was not homebound because C.L. had a long history of anxiety. (Dkt. 16-44, Silva Test. 137:18-21, 142:8-20.) Considering that C.L.'s Parents alleged tort-like misconduct by BSD staff throughout the IEP team process, BSD's reluctance to consider options other than an immediate to Hillside is, from a tort liability perspective, perhaps understandable. But that reluctance to change position is inconsistent with BSD's duties under the IDEA, particularly when C.L.'s Parents and C.L.'s medical providers advanced legitimate concerns about immediately forcing C.L. back into an environment he feared.

The precise cause of C.L.'s anxiety or his behaviors at school is not pertinent to the Court's analysis. While the causation question may be important in a tort case, the critical question in this IDEA case is whether BSD provided C.L. with a meaningful opportunity to receive educational benefit after October 14, 2011. As discussed above,

there is a lack of evidence to substantiate the Parents' allegations that C.L. was abused by BSD personnel. Although C.L. is not a reliable reporter of objective facts, the record nevertheless demonstrates that C.L. *perceived* he was abused in Ms. Badger's classroom and on the bus. Because C.L. was disciplined at Hillside and on the bus, there is evidence that C.L.'s perceptions were based on real events, not delusional fabrications. According to his Parents, C.L.'s perceptions rendered him too anxious to return to Hillside, a reaction entirely consistent with C.L.'s long history of anxiety towards new environments.

BSD cites decisions from an Alabama hearing officer and California administrative law judge for the proposition that a school district need not acquiesce to parents' request for homebound services once the IEP team concludes the services are not educationally necessary. Not only are these administrative decisions non-binding, they are unpersuasive. In the Alabama case, the student wanted to be in school, and there was no evidence that the student suffered from a condition that might require homebound instruction. *Troy City Bd. of Ed.*, 43 IDELR 106 (SEA Al. 2005). In the California case, the autistic student did not suffer from anxiety regarding the proposed school placement, and the school district specifically assessed the potential benefits of a home placement. *Poway Unified Sch. Dist.*, 53 IDELR 208 (SEA Cal. 2009). Here, by contrast, C.L.'s anxiety related to the very classroom where his IEP would be implemented, and BSD did not seriously consider a different placement until C.L. had been absent for several months.

Despite the Parents' reports to the contrary, BSD consistently maintained that C.L.'s anxiety during his absence was no different than anxiety he exhibited before his absence. Even if this conclusion is correct in hindsight, the problem is that it was based on observations before C.L. left school and dismisses the Parents reports after C.L.'s absence. Simply put, BSD had no basis for concluding that C.L. could return to school at any time. Furthermore, it was not the Parents' responsibility to prove C.L.'s anxiety was more severe than usual; rather, it was BSD's duty to evaluate C.L. in light of the Parents' legitimate concerns and Dr. Kiehl's recommendation.

BSD failed to do so and, consequently, forced C.L.'s Parents to choose either a potentially traumatizing return to Hillside or no school at all. Thus, the Court concludes that C.L. was denied FAPE until BSD again offered him a meaningful opportunity to receive educational benefits.

As explained above, the Court finds BSD temporarily denied C.L. FAPE because C.L. returned to school in June of 2012. C.L.'s Parents filed their due process complaint just a few days before BSD offered to implement the December 2011 IEP, BIP, and FBA at a different school, Les Bois, and in conjunction with a reintegration plan—a proposal that ultimately facilitated C.L.'s return to school. To the extent C.L.'s Parents also argue this package of special education services is substantively deficient, the Court affirms HO Uranga's finding that C.L.'s eventual placement in the structured learning center at Les Bois Junior High School comports with the IDEA. But this does not excuse several months of no services at all. Accordingly, the Court will order additional briefing on the appropriate remedy for BSD's temporary failure to provide FAPE to C.L.

# CONCLUSION

BSD temporarily denied C.L. FAPE by failing to provide him any educational services while the IEP team formulated a plan to reintegrate C.L. into the school environment. Although BSD provided C.L. a meaningful opportunity to receive educational benefits at Hillside before October 14, 2011, its stubborn insistence that C.L. could simply return to Hillside at any time inappropriately shifted the burden of complying with the IDEA to C.L.'s Parents. BSD embraced this position without seriously considering alternatives that might have addressed the Parents' legitimate concern that their son would be harmed by returning to a school environment that he—rightly or wrongly—feared. HO Uranga erred by finding this course of action met the IDEA's substantive requirements.

# ORDER

Based upon the foregoing, the Court being otherwise fully advised in the premises,

**IT IS HEREBY ORDERED** that Special Education Hearing Officer Jean Uranga's Findings of Fact, Conclusions of Law, and Order is **AFFIRMED IN PART AND REVERSED IN PART**. Specifically, the Court finds HO Uranga erred by upholding Defendant's refusal to provide C.L. homebound services without first adequately evaluating the Parents' request and C.L.'s need for those services.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment (Dkt. 24) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs shall file a brief, not to exceed 15 pages, regarding appropriate relief in this case on or before April 28, 2014. Defendant shall file a response to Plaintiffs' brief, also not to exceed 15 pages, on or before May 19, 2014. Plaintiffs shall not file a reply unless specifically requested or otherwise allowed in advance by the Court. The parties' briefing should address compensatory relief available under the IDEA.

Dated: March 28, 2014

Honorable Candy W. Dale
United States Magistrate Judge